STROOCK & STROOCK & LAVAN LLP
JAMES E. FITZGERALD (STATE BAR NO. 108795)
*jfitzgerald@stroock.com*
DANIEL A. ROZANSKY (STATE BAR NO. 161647)
*drozansky@stroock.com*
BENJAMIN T. POTTER (STATE BAR NO. 260588)
*bpotter@stroock.com*
2029 Century Park East
Los Angeles, CA  90067-3086
Telephone: 310-556-5800
Facsimile: 310-556-5959
E-Mail:  lacalendar@stroock.com

Attorneys for Plaintiffs
  ARAMID ENTERTAINMENT FUND LIMITED and
  CAYMAN FILM HOLDINGS LIMITED

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARAMID ENTERTAINMENT FUND LIMITED AND CAYMAN FILM HOLDINGS LIMITED, <br><br> Plaintiffs, <br><br> vs. <br><br> DAVID BERGSTEIN and RONALD TUTOR, <br><br> Defendants. | Case No. CV10-01881 JFW (PLAx) <br><br> [Before the Hon. Judge John F. Walter, Ctrm. 16] <br><br> **OFFER OF PROOF RE EXPERT WITNESSES** <br><br> Action Filed:  March 16, 2010 <br> Pre-Trial Conference: April 15, 2011 <br> Trial Date:  May 3, 2011 |

LA 51399602

1       Plaintiffs Aramid Entertainment Fund Limited ("Aramid") and Cayman Film

2   Holdings Limited ("Cayman" and collectively "Plaintiffs") intend to call the

3   following witnesses to provide expert testimony:

4   **ERIC BRIGGS:**

5       If allowed to testify as an expert, Eric Briggs will testify as follows:

6   **A.**   **Background**

7       The Salter Group was founded during 2003.  Mr. Briggs is a co-founder of The

8   Salter Group.  His title with The Salter Group is Principal, and he has been a

9   Principal of The Salter Group ever since it was founded in 2003.  (Deposition of Eric

10  C. Briggs ("Briggs Depo"), Vol. I, at 11:5-14.)  The Salter Group is a leading

11  independent financial and strategic advisory firm that specializes in providing

12  financial opinions, valuations, financial and strategic analysis and transaction support

13  covering a broad spectrum of industries and situations from early stage, middle

14  market and Fortune 500 companies and capital market constituents.  Prior to working

15  at The Salter Group, Mr. Briggs was an associate with Houlihan, Lokey, Howard &

16  Zukin, an investment bank and financial advisory firm.  (Briggs Depo, Vol. I, at

17  11:15-22.)  In addition to the experience listed in his curriculum vitae, Mr. Briggs

18  has forecasted and valued hundreds of film libraries involving major studios and

19  independent distributors.  Such exercises have been scrutinized by studios, banks and

20  investors globally.  Mr. Briggs has conducted such valuations under a variety of

21  valuation frameworks (e.g., fair market value, fair value, liquidation value) and for a

22  variety of uses (e.g., collateral, internal planning, litigation).

23       Mr. Briggs was retained by Stroock to conduct an analysis on the film "Love

24  Ranch."  In particular, Mr. Briggs and The Salter Group were asked to express an

25  opinion (the "Opinion") on the fair market value as of December 7, 2009 ("Valuation

26  Date"), of  "Love Ranch" ("Love Ranch" or the "Film") on a controlling interest

27  basis.  (Expert Witness Report of Eric C. Briggs ("Briggs Report"), at p. 1.)  Mr.

28  Briggs will explain that the term "on a controlling interest basis" references the

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 1 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1  typical buyer of those films having effective control over their future distribution,

2  exploitation and the like.  (Briggs Depo, Vol. I, at 142:1-8.)  Mr. Briggs will explain

3  that all valuation methodologies that estimate the worth of a film as a static asset are

4  predicated on numerous assumptions pertaining to prospective economic and

5  operating conditions.  (Briggs Report, at p. 1.)

6       Mr. Briggs was primarily responsible for doing the valuation of "Love

7  Ranch."  (Briggs Depo, Vol. I, at 72:15-18.)  Mr. Briggs and The Salter Group first

8  began performing work in connection with "Love Ranch" on or around November 5,

9  2009.  (Briggs Depo, Vol. I, at 84:21-24.)  Mr. Briggs saw certain scenes from the

10  Film in advance of preparing his Opinion.  (Briggs Depo, Vol. II, at 158:21-25.)

11       As set forth below, based on his research, expertise and the documents he

12  reviewed, Mr. Briggs opined that the value of "Love Ranch" as of December 7, 2009

13  was " between a low of $1,622,100 and a high of $2,013,400.  (Briggs Report, at p.

14  3.)

15       Mr. Briggs will explain that, as of the date of the Opinion, the domestic and

16  global financial markets faced certain significant challenges.  At that time, it

17  remained unknown whether the actions of various governments and global banking

18  institutions would be successful in providing greater stability to the financial markets

19  (and if so, what the timing and sequencing of corresponding events would be).

20  While such factors were considered to a certain degree as part of The Salter Group's

21  analysis, they assumed that the general economic and other related conditions

22  (including their impact on the Film) would become less uncertain in the near future.

23  (Briggs Report, at p. 1.)

24  **B.**  **Definitions**

25       Mr. Briggs will define the following key terms, if necessary, as used in The

26  Salter Group's analyses:

27       The term "fair market value" is defined as ". . . the price at which the property

28  would change hands between a willing buyer and a willing seller when the former is

- 2 -

not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." This definition was taken from IRS Revenue Ruling 59-60.

The term "cycle," or "sale" is defined as a period of time during which a title is exploited in a variety of media formats. The first cycle generally references the first ten to fifteen years of a film's economic life. Each subsequent cycle (e.g., second cycle, third cycle, etc.) references the subsequent periods of a film's economic life in five-year increments. With respect to the analysis The Salter Group conducted, they noted that certain titles were sold for longer periods of time than traditional cycles.

The term "Gross Receipts" is defined as the aggregate levels of licensing and/or distribution receipts as would be received without any form of deduction by a distributor.

The term "Net Receipts" is defined as the Gross Receipts after the deduction of all relevant costs, which may potentially include, but are not limited to, distribution fees, distribution expenses, participations, residuals, other third party payments and any applicable advance recoupments. (Briggs Report, at p. 5.)

## C.   **Due Diligence Overview**

Mr. Briggs will testify that he and The Salter Group made such reviews, analyses and inquiries that they deemed necessary and appropriate under the circumstances. Among other things, he and The Salter Group did the following:

(i)     reviewed cast and summary information regarding the Film, requested from and provided by Aramid in the file 'Love Ranch - Cast & Summary.doc' (bates labled Salter_360-367; Plaintiffs' Exhibit 70);

(ii)     reviewed by-territory license fee estimates for "Love Ranch," requested from and provided by Aramid in the file 'Love Ranch sales and estimates.xls, prepared by Capitol Films as of August 10, 2007 (such

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 3 -

LA 51399602

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1    estimates for the Film will be referred to herein as the "Producer

2    Estimates") (bates labeled Salter_368-371; Plaintiffs' Exhibit 71);

3    (iii)    reviewed by-films production budget information for the Film,

4          requested from and provided by Aramid in the file 'Love Ranch -

5          Budget.pdf,' prepared as of January 30, 2008 (bates labeled Salter_222-

6          364; Plaintiffs' Exhibit 72);

7    (iv)    reviewed a completion budget schedule for Love Ranch, requested from

8          and provided by Aramid in the file "LOVERANCHcrd091117.pdf,'

9          prepared as of November 17, 2009 (bates labeled Salter_209-221;

10         Plaintiffs' Exhibit 73);

11    (v)    reviewed by-title, liability information, requested from and provided by

12         Aramid in the file 'Outstanding Liabilities - Love Ranch.doc' (bates

13         labeled Salter_372-373; Exhibit 74 to Briggs Depo);

14    (vi)    reviewed by-title, by-territory distribution agreements (individually

15         "D.A.") and notice of availability information (individually "N.O.A."),

16         requested from and provided by Aramid (Plaintiffs' Exhibit 75);

17    (vii)    reviewed certain rights availability information on a by-title, by-territory

18         basis for the Film, as requested from and provided by Aramid (bates

19         labeled Salter_368-371, AEFG_20905-20907, AEFG_6760-6763;

20         Plaintiffs' Exhibits 105, 106, 107);

21    (viii)   spoken with industry experts regarding the economic potential for

22         independent film content similar to the Film; and conducted such other

23         interviews, studies, analyses and inquiries as he and The Salter Group

24         deemed appropriate.

25 (Briggs Report, at pp. 5-6.)  Mr. Briggs will also testify that he and The Salter Group

26 are constantly in contact with various persons who are active in the entertainment

27 business and the conversations arising from those contacts most likely informed their

28 views and opinions as well.  (Briggs Depo, Vol. I, at 48:20-49:3.)  In addition, Mr.

- 4 -

1   Briggs and The Salter Group references various documents in the public and in

2   websites, publications and so forth.  (Briggs Depo, Vol. I, at 94:6-15.)

3   **D.**      **Film Overview**

4          Mr. Briggs will testify that the Film tells the story of a couple whose

5   faithfulness is tested with deadly results after starting Nevada's first legal brothel.

6   The Film includes such key cast members as Joe Pesci, Helen Mirren and Gina

7   Gershon.  Based upon information requested from and provided by Aramid, the

8   Film's production budget was approximately $21MM.  (Briggs Report, at p. 7.)

9   **E.**      **Methodology Overview**

10          Mr. Briggs will testify that, in their analysis of the Film, Mr. Briggs and The

11   Salter Group took into consideration the Film's prospective income and cash

12   generating capability.  Typically, an investor contemplating an investment in a film

13   with income and cash generating capability similar to the Film will evaluate the risks

14   and returns of its investment on a static asset basis.

15          Accordingly, after due consideration of other appropriate and generally

16   accepted valuation methodologies, the value of the Film was developed primarily on

17   the basis of the income approach using the discounted cash flow method ("DCF").

18          The DCF method involves determining a valuation indication for a cash-

19   generating asset, and is particularly well-suited to the valuation of intangible assets

20   such as the Film.

21          The DCF methodology involves the following key steps:

22          (i)      the determination of cash flow forecasts ("Representative Level

23                   Projections"); and

24          (ii)      the selection of a range of comparative investment-risk-adjusted

25                   discount rates to apply against the Representative Level Projections.

26   (Briggs Report, at p. 8.)

27

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 5 -

LA 51399602

## F.  Representative Level Projections

Mr. Briggs will testify as to the methodology he employed to determine estimates of prospective performance of the Film.  With respect to estimating the prospective performance of the Film, he and The Salter Group developed forecasts for the years ending December 31, 2010 through 2012.  Based on discussions with Aramid, Mr. Briggs and The Salter Group assumed that the anticipated foreclosure date would be December 8, 2009 ("Foreclosure Date").  Based on Mr. Brigg's and The Salter Group's understanding of the distribution prospects for the Film in the near term, he and The Salter Group assumed cash flows associated with the Film would not begin until March 31, 2010.  (Briggs Report, at p. 8.)

Mr. Briggs will testify that, in order to develop representative level estimated financial performance for the Film, he and The Salter Group performed the following steps:

(i)  Forecast Territories:  The Salter Group developed forecasts in twelve territories ("Forecast Territories"), in addition to a rest of world territory ("ROW") in order to account for performance not specifically captured by the Forecast Territories.  Performance estimates for ROW were developed based upon license fee information for the Forecast Territories relative to ROW, contained within the Producer Estimates and other information requested from and provided by Aramid.  Further, such Forecast Territories were determined based upon Mr. Briggs' and The Salter Group's observations of by-territory performance for similar assets and are displayed in the table below:

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 6 -

| 1 Australia | 7 Italy |
|---|---|
| 2 Benelux | 8 Japan |
| 3 North America | 9 Latin America |
| 4 Eastern Europe | 10 Scandinavia |
| 5 France | 11 Spain |
| 6 Germany | 12 UK |

(Briggs Report, at pp. 8-9.)

Mr. Briggs will explain, if necessary, that Exhibit B-1 in his and The Salter Group's report is a chart illustrating Mr. Briggs' and The Salter Group's financial analysis of the Film. The chart lists various major territories the film would potentially be exploited in. These territories generally represent the international territories reflecting the greatest economic potential for a film's exploitation. The chart further lists the sum of a three-year forecast on a by-territory basis for the Film. (Briggs Depo, at 88:1-90:11.)

Mr. Briggs will further explain, if necessary, that, based upon information from Aramid, Aramid's counsel, general market information and Mr. Briggs' and The Salter Group's expertise, he and The Salter Group identified a listing of territories for which they would develop specific forecasts. Mr. Briggs and The Salter Group estimated license fees assuming effectively an outright sale of the rights in a given territory. Those estimated license fees were then adjusted based on the various risk factors (described below) to reflect the amounts totaled in Exhibit B-1 to Mr. Briggs' and The Salter Group's report. (Briggs Depo, Vol. I, at 91:11-92:14.)

(ii)     By-Territory License Fees:  With respect to determining by-territory license fees for the Film, Mr. Briggs and The Salter Group first observed and developed unadjusted license fee ("Unadjusted License Fees") information based upon:  (1) by-territory estimates of gross, all-rights, license fees for the Film, based on the Producer Estimates and

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 7 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1   other information requested from and provided by Aramid; and (2) Mr.

2   Briggs' and The Salter Group's observations of by-territory, all-rights

3   license fees for similar assets given current market conditions;

4   After consideration of the information detailed above, Mr. Briggs and

5   The Salter Group determined by-territory Unadjusted License Fees,

6   indicative of performance levels achievable for films: (1) under a

7   willing buyer/willing seller scenario; (2) distributed by reputable

8   distributors; and (3) exclusive of any litigious parties.  In determining

9   such Unadjusted License Fees, Mr. Briggs and The Salter Group

10  estimated aggregate license fees reflecting a distinct licensing sale.

11  Under such forecasts, prospective cash flows arising from the territories

12  thereafter (such as coverages, relicenses and so forth) would be

13  generally immaterial.

14  Subsequently, Mr. Briggs and The Salter Group applied certain

15  adjustments to the Unadjusted License Fees in order to reflect the

16  unique circumstances under which the Film was to be distributed

17  resulting in a level of risk-adjusted license fees ("Risk-Adjusted License

18  Fees") (Briggs Report, at p. 9);

19  (iii)   By-Territory Availabilities:  For territories with observed historical

20  sales, as determined based on information requested from and provided

21  by Aramid, Mr. Briggs and The Salter Group assumed that such

22  territories would not be available for current or future licensing.

23  Further, in identified territories with no indicated historical sales activity

24  as observed in the information requested from and provided by Aramid,

25  Mr. Briggs and The Salter Group assumed that the Film would currently

26  be available for sale (Briggs Report, at p. 9);

27  (iv)   Determination of Gross Receipts:  Based upon the by-territory

28  availability and license fee information discussed above, Mr. Briggs and

- 8 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

The Salter Group developed Gross Receipts for the period ending December 31, 2010 through 2012.  Such forecasts represent single by-territory, all-rights, licensing events, spread over a three year period to account for any potential delays in the collection of receipts (Briggs Report, at p. 9); and

    (v)    <u>Determination of Net Receipts</u>:  In order to determine Net Receipts from the Film, Mr. Briggs and The Salter Group applied a deduction to Gross Receipts, reflecting a sales fee to a third party distributor/sales agent (Briggs Report, at p. 9).

## G.    Licensing Risk Factors/Risk Adjusted License Fees

Mr. Briggs will testify that, in developing the appropriate Risk-Adjusted License Fees on a prospective basis, he and The Salter Group considered certain unique risk factors associated with the Film as listed below:

    (i)    The previous and potential future litigation associated with the Film and associated chain of title complications which may arise from such litigation;

    (ii)    The current reputation of the Film and its market position;

    (iii)    Various challenges associated with the current independent film market for exploiting films as observed by Mr. Briggs and The Salter Group;

    (iv)    The age of the Film and the associated impact on the potential marketability of the Film relative to newer content; and

    (v)    Challenges associated with developing a distribution strategy for the Film given the unique nature under which the rights to the Film may potentially have been acquired.  (Briggs Report, at p. 10.)

With respect to the reputation of the Film, Mr. Briggs will testify that the Film had been available to some extent for international buyers for a meaningful period of time starting possibly as early as 2007 and there had been limited success in selling the Film, as evidenced by the limited number of sales that existed at the time of Mr.

Briggs' and The Salter Group's valuation (after extensive sales efforts by Capitol Films); that the subject matter of the film may have impacted the Film's ability to generate sales in international markets, specifically being Las-Vegas themed or American-themed subject matter, and that it may have been generally known that the film was associated with various litigation, Capitol Films and some other related entities.  (Briggs Depo, Vol. II, at 236:4-237:11.)  In addition, Mr. Briggs will testify that he recalls that David Bergstein's involvement with the Film was one of the risk factors that was considered and may have potentially contributed to the overall determination of risk adjusted license fees.  (Briggs Depo, Vol. II, at 237:21-238:21.)

With respect to the various challenges associated with the current independent film market for exploiting films, Mr. Briggs will testify that during the 12 to 18 months leading up to the Valuation Date, specifically referencing calendar 2009 and much of calendar 2008, the global economic recession led to very challenged financial positions for many of the distributors overseas as well as in the U.S.  By virtue of this, many of the producers of films were having a much harder time selling those films for the levels of license fees they had historically received.  (Briggs Depo, Vol. II, at 240:8-241:2.)

With respect to the challenges associated with developing a distribution strategy for the Film given the unique nature under which the rights to the Film may potentially have been acquired, Mr. Briggs will testify that a potential acquirer of the rights associated with the Film may end up acquiring those rights through a litigious process or a foreclosure process or something of this sort.  Given the nature of those types of efforts, following those efforts it becomes quite complicated to develop an effective strategy to then exploit a film, particularly when parties that are knowledgeable in the industry are aware of the taint associated with the film. (Briggs Depo, Vol. II, at 245:15-246:13.)

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 10 -

1    Other relevant factors include the territories that the sales were associated

2    with, the time, the amount of time that had passed since sales has taken place and the

3    state of production of the film.  (Briggs Depo, Vol. I, at 140:15-141:1.)

4    Based upon the above elements, and further discussions with Aramid, Mr.

5    Briggs and The Salter Group applied certain downward adjustments to the

6    Unadjusted License Fees in order to determine the Risk-Adjusted License Fees to

7    apply on a prospective basis for purposes of their analysis.  (Briggs Report, at p. 10.)

8    **H.    Other Considerations**

9    Mr. Briggs will testify that, based on information requested from and provided by

10   Aramid, he and The Salter Group noted that there were historical sales in certain

11   territories for each Film.  Mr. Briggs and The Salter Group further noted that certain

12   historical sales may have been collected as of the Valuation Date based on

13   information requested from and provided by Aramid.  Based on discussions with

14   Aramid for purpose of developing certain valuation indication scenarios portrayed

15   herein, Mr. Briggs and The Salter Group included the amount of historical sales from

16   such territories, net of any collections as of the Valuation Date, as an add-back to

17   value, as reflected in Exhibit A-1 of the support schedules to the report.   (Briggs

18   Report, at p. 10; Briggs Depo, Vol. I, at 131:17-132:11.)  The supporting schedules

19   detail how Mr. Briggs and The Salter Group aggregate the various components of the

20   analysis.  For purposes of incorporating such amounts, The Salter Group applied

21   certain sensitivities to the uncollected receipts to reflect certain risk factors including,

22   but not limited to:

23       (i)    Previous and potential future litigation associated with the Film and

24              certain ambiguity surrounding the historical distribution agreements;

25       (ii)   The amount of time passed since the historical distribution agreements

26              were developed, which could impact the likelihood that such amounts

27              will be collected in the future; and

28       (iii)  Certain delays and ambiguity surrounding the delivery date of the Film.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 11 -

(Briggs Report, at p. 10.)

Mr. Briggs will testify that he and The Salter Group noted that the Producer Estimates did not include forecast performance for the domestic rights associated with the title.  Notwithstanding the foregoing, based on discussions with Aramid, Mr. Briggs and The Salter Group developed Domestic forecasts for "Love Ranch," based upon the information available to them.

Based upon information requested from and provided by Aramid, Mr. Briggs will testify that "Love Ranch" may have required additional funding in order to complete production.  In particular, Mr. Briggs will testify that he recalls that there were certain post-production activities or production activities that needed to take place for the Film to be completed.  (Briggs Depo, at Vol. I, at 80:6-13.) Notwithstanding the foregoing, for purposes of their analysis, Mr. Briggs and The Salter Group assumed that the Film was completed and available for current and future licensing as of the Valuation Date with appropriate chain-of-title and other relevant marketing elements in place.  That said, for purposes of developing the valuations, Mr. Briggs and The Salter Group reflected the deduction of additional potential production costs for Love Ranch, as detailed in Exhibit A-1 of the support schedules, and as discussed in more detail below.  (Briggs Report, at pp. 10-11.) These deductions were updated as of February 1, 2009.  (Briggs Depo, Vol. I, at 80:25-81:13.)

## I.   <u>Administrative/Overhead Costs</u>

Mr. Briggs will testify that, for purposes of their analysis, Mr. Briggs and The Salter Group considered certain administration and servicing costs to represent the overhead and administrative costs that a prospective acquirer or financier would incur in exploiting the underlying rights, which include but are not limited to the following items:

(i)     salaries and bonuses;

(ii)    benefits;

LA 51399602

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1       (iii)   promotions and marketing;

2       (iv)   travel and entertainment; and

3       (v)   general office expenses.

4       The administration and servicing costs also reflect certain profitability

5   objectives of acquirers and financiers of filmed entertainment content.

6       Mr. Briggs and The Salter Group determined appropriate levels of

7   administration and servicing costs as consistent with their observations of typical

8   market behavior associated with filmed entertainment content.  Based on such

9   observations of acquirers and financiers valuing filmed entertainment content, Mr.

10  Briggs and The Salter Group have deducted administration and servicing costs as a

11  percentage of gross cash flow (versus a net basis — net of third party payments and

12  other relevant expenses).  (Briggs Report, at p. 11.)

**J.**    **Calculation of Estimated Taxes**

14      Mr. Briggs will testify that it was the understanding of he and The Salter

15  Group that in the case of a foreclosure, a lender would not have been obligated to pay

16  state and federal taxes arising from the cash receipts of the Film, as such cash

17  receipts would represent a recovery of principal.  As such, Mr. Briggs and The Salter

18  Group developed fair market value indications for the Film on a pre-tax basis.

19  (Briggs Report, at p. 11.)

**K.**    **Discount Rates**

21      Mr. Briggs will testify that a discount rate represents the rate of return an

22  investor requires to justify investment in an entity giving consideration to the risk

23  associated with the investment.  Discount rates are determined based on market

24  expectations of the total rate of return and the rate at which capital will be attracted

25  to an entity.  One of the most important considerations in determining an appropriate

26  discount rate is the level of risk inherent within an entity.  Therefore, due

27  consideration is given to the rates of return available on alternative comparable

28  investments available to a hypothetical buyer.  (Briggs Report, at p. 11.)

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 13 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1    Mr. Briggs will testify that numerous factors influence the choice of an
2  appropriate discount rate including those factors external (potentially systematic) and
3  internal (potentially unsystematic) to the potential investment.  External factors
4  include, but are not limited to: ( 1) current general economic conditions; (2)
5  expectations regarding future economic conditions as of the Valuation Date; (3)
6  sources of capital available against an asset; and (4) competitiveness of the markets
7  served by the asset.  Internal factors may include, but are not limited to:  (1) the
8  financial performance of an asset; (2) the ability to generate positive cash flows; and
9  (3) the ability to deliver products and services to an available market.  (Briggs
10  Report, at pp. 11-12.)

11    For purposes of determining the appropriate range of comparative investment-
12  risk-adjusted discount rates to apply against the Representative Level Projections,
13  Mr. Briggs and The Salter Group applied the Film's weighted average cost of capital
14  ("WACC"). The WACC is calculated by multiplying the:  (1) the pre tax cost of a
15  hypothetical senior secured loan facility ("Kd") applied against the total value of
16  debt relative to the total value of the enterprise; and (2) the cost of equity ("Ke")
17  applied against the total value of equity relative to the total value of the enterprise.
18  The formula for the pre-tax WACC is found below:

19    $WACC = Kd * (d\%) + Ke * (e\%)$

20    Where:

21    Kd = Pre-tax cost of a senior secured loan facility

22    Ke = Cost of Equity

23    d% = Value of interest-bearing debt relative to total enterprise value

24    e% = Value of equity relative to total enterprise value

25    (Briggs Report, p. 12.)

26    Mr. Briggs will testify that, to determine the Ke, he and The Salter Group
27  considered:  (1) indications arising from the Capital Asset Pricing Model ("CAPM");
28  and (2) information from providers of equity capital for similar assets.  To determine

the Kd, Mr. Briggs and The Salter Group considered:  (1) information regarding floating debt market rates such as the 6-month LIBOR rate as of the Valuation Date; (2) information from providers of debt capital for similar assets; and (3) Mr. Briggs' and The Salter Group's observations of senior debt levels among similar assets.

Mr. Briggs and The Salter Group considered a weighted average of the Film's Kd applied against d% in the range of 20.0% to 15.0% and the Film's Kc applied against c% in the range of 80% to 85%.

Based upon these analyses, Mr. Briggs and The Salter Group utilized a pre-tax WACC for the Films in the range of 15.5% to 18.0%, as demonstrated in Exhibit C-1 to the report.  (Briggs Report, at p. 12.)

## L.     **The Valuation**

Mr. Briggs will also testify that the Opinion includes two different scenarios in terms of the value for Love Ranch.  One scenario includes consideration of a future collection of various historically entered into contracts accounts receivable (scenario 2) and one does not (scenario 1).  The Salter Group was asked by Aramid's counsel to provide these two separate scenarios.  (Briggs Depo, Vol. I, at 127:11-128:10.)

Mr. Briggs will testify that The Salter Group understood that the distributor for the Film had not succeeded in licensing the Film in any other territories other than Eastern Europe and ROW.  Where Mr. Briggs and The Salter Group understood that there were no material sales in territories, they developed forecasts for those territories.   (Briggs Depo, Vol. I, at 133:1-134:2.)

Mr. Briggs will testify that he and The Salter Group developed a by-territory rights license fee estimate for "Love Ranch" by virtue of considering his and The Salter Group's general experience in the industry, comparable data to the extent available, the other information reflected in the due diligence listing of the report as well as the licensing risks factors and risk adjusted license fees identified in the report.  (Briggs Depo, Vol. II, 206:10-21.)

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 15 -

LA 51399602

1    Mr. Briggs will explain, if necessary, that in developing the risk-adjusted

2    license fees, he and The Salter Group assumed in each territory, that the distributor

3    would conduct a one-time, all-rights sale in that territory and the amount paid for

4    those rights would effectively capture the economic value, the economic profits that

5    particular film would generate in that territory during, perhaps, a 10, 15, or 20-year

6    period of time, all captured in a single, one-time payment.  The license fee is spread

7    over a 3 year period of time to capture a number of factors, notably including:  (1),

8    the payment terms associated with distribution contracts which typically call for

9    staggered payments; and (2) the possibility that sales may not take place in any given

10   year specifically and timing of receipt of cash flows associated with those sales

11   would have some level of impact on value.  (Briggs Depo, Vol. II, at 226:5-24.)

12       Chart A1 to Mr. Briggs' report details the valuation opinion for Love Ranch

13   after consideration of remaining expenses to complete the film, and adds the

14   estimated value of uncollected historical sales.  Chart A2 details cash flow of

15   estimated gross receipts for Love Ranch, taking into account the deduction of sales

16   fees, administrative expenses and overhead, and applying a discount rate to

17   determine the present value of the estimated future gross receipts.

18   **M.**    **Opinion Re Value**

19       Mr. Briggs and The Salter Group relied on all the factors set forth herein to

20   come to the conclusion that the value of "Love Ranch" as of December 7, 2009 was

21   between a low of $1,622,100 and a high of $2,013,400.  (Briggs Report, at p. 3.)

22   **N.**    **The Focus Report**

23       Mr. Briggs will testify that the Focus Report attributes international sales

24   estimates to ten allegedly comparable, but undisclosed, films.  Accordingly, Mr.

25   Briggs will testify that Table 4, located in Section 4.3 of the Focus Report, does not

26   appear to support the valuation conclusions set forth in Report for the following

27   reasons:

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 16 -

(i)   Table 4 does not identify the selected comparable films.  As such, Mr. Briggs and The Salter Group are unable to assess whether these films are comparable to the Film based on a customary consideration of, among other appropriate elements:  (1) genre; (2) storyline; (3) key talent; (4) distribution strategy; and (5) international appeal.

(ii)   Of the 10 films listed in Table 4, only 3 films have actual international sales performance; the remaining 7 films reflect estimated international sales.  Based on the limited information provided in the Focus Report, Mr. Briggs and The Salter Group are unable to assess whether the estimated performance for the 7 films provides a reasonable basis for the Film's potential performance in the international market.  In addition to the lack of information regarding the characteristics of the films, Table 4 does not contain the following important information:  (1) when the sales estimates were prepared; (2) who prepared the sales estimates; and (3) the purpose and use of the sales estimates.  With respect to item (1), to the extent that the sales estimates were prepared prior to 2008, such estimates would not reflect the market challenges and conditions present as of the Valuation Date.  With respect to item (2), Mr. Briggs will testify that the preparer of the sales estimates plays an important role in assessing whether such estimates are an appropriate basis of a film's future performance.  For example, estimates prepared by an independent third party that is actively engaged in the international film market would provide a more reliable estimate as compared to estimates prepared by a person with limited knowledge or exposure to the international film market.  With respect to item (3), Mr. Briggs will testify that the level of sales estimates for a film may vary depending on the purpose and use of the sales estimates.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 17 -

LA 51399602

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

(iii)   Seven of the films listed in Table 4 of the Focus Report reflect films that were released after the Valuation Date. As such, information for such films may not have been available prior to the Valuation Date and, therefore, would not be appropriate to use to value the Film as of the Valuation Date.

(iv)   Assuming that the films included in Table 4 are comparable to the Film, consideration of three or less data points (after removing estimates and films completed after the Valuation Date) reflects an atypically small dataset and, therefore, may not be a reliable basis for projecting international sales performance. (Rebuttal Expert Witness Report of Eric C. Briggs ("Suppl. Briggs Report"), at pp. 1-2.)

Mr. Briggs will testify that Section 6.2 of the Focus Report describes the two techniques applied by Mr. Fier for purposes of selecting a series comparable films that were used to estimate base case domestic box office performance for the Film: the Netflix algorithm; and (2) Amazon.com's list of similarly purchased products as portrayed in Appendix 1. Mr. Briggs will testify that it is his opinion that these techniques, without consideration of other factors, are not appropriate for purposes of selecting comparable films in order to estimate domestic box office performance for the reasons detailed below:

(i)   The two techniques applied by Mr. Fier in the Focus Report drew upon information that would not have been available as of the Valuation Date. Further, the resulting selection of films includes films that were released subsequent to the Valuation Date. To the extent that such selection techniques were applied on or prior to the Valuation Date, the results would have yielded inconclusive results or varied significantly from Appendix 1. For sake of clarity, the Film had not yet experienced a theatrical or home entertainment release as of the Valuation Date. However, both techniques rely on information that is available at the

time that an inquiry is performed on the Amazon or Netflix website (which Mr. Fier performed much later than the Valuation Date).

(ii)   The selection techniques applied in the Focus Report do not consider certain key factors that should be considered in selecting comparable films. For example, factors that are typically considered in selecting a series of comparable films include, but are not limited to: (1) the distributor of the films; (2) the distribution strategy of the films; and (3) the age of the films. Film distributors are typically classified as a major studio, a mini-major or major studio specialty label, or an independent. Based on Mr. Briggs' experience, distribution through a major studio, mini-major or major studio specialty label presents several advantages over distribution through an independent distributor as they have: (1) increased access to capital that can be used to finance theatrical releasing costs (largely consisting of advertising costs); (2) increased leverage with respect to negotiating terms with film exhibitors based on a larger market presence; and (3) contractual output arrangements with respect to certain key media windows, such as pay television. With respect to the Film, the domestic distributor was not known as of the Valuation Date.

Further, Mr. Briggs and The Salter Group understood that parties involved with the Film were unable to secure a domestic distributor during the two years prior to the Valuation Date. As such, distribution through a major studio, mini-major or major studio specialty label may not have been available for the Film. Nonetheless, Mr. Biggs and The Salter Group noted that 7 of the 20 films identified in Appendix 1 were released through a major studio, mini-major or major studio specialty label. Not surprisingly, such films represent 6 of the 10 highest domestic box office performers of the 20 selected films, which

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51399602

contributed to the high level of base case domestic box office performance estimated by Mr. Fier.

With respect to the distribution strategy, most of the films included in Appendix 1 of the Focus Report reflect films with limited initial theatrical releases as consistent with the expectations of the Film as of the Valuation Date.  However, "Going the Distance," which reflects the third highest adjusted domestic box office performance of the selected films, was released on over 3,000 screens, which is not consistent with the distribution strategy envisioned, and ultimately employed, for the Film.  With respect to age of the films, the selection of comparable films typically considers films that were released not more than five to seven years prior to the date of an analysis.  However, Appendix 1 includes "Frida," which was released in 2002 and "Pollock," which was released in 2000.  Further, these two films reflect the first and fourth highest level of adjusted domestic box office portrayed in Appendix 1 at $35.3 million and $12.7 million, respectively.  By removing "Going the Distance," "Frida" and "Pollock," the average domestic box office performance decreases from $5.9 million as applied in the Focus Report to $3.1 million.

(iii)   Mr. Fier estimated base case domestic box office performance as the average adjusted box office performance of a selection of comparable films as detailed in Appendix 1 of the Focus Report.  Such approach does not consider the likelihood that a given level of performance would occur on a single film basis.  Specifically, the small number of high-performing films reflected in Appendix 1 (notably "Frida," "The Kids Are All Right," "Going the Distance" and "Pollock") lead to results that are skewed upwards.  Applying the median level of domestic box office performance would lead to a result that more appropriately considers the

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067–3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

likelihood of occurrence based on the selection of comparable films. Specifically, based on the films included in Appendix 1, the median domestic box office performance is $1.1 million. Removing the three films identified above further decreases the median domestic box office performance. (Suppl. Briggs Report, at pp. 2-4.)

Mr. Briggs will testify that Section 6.3 of the Focus Report describes the methodology applied by Mr. Fier for purposes of estimating the high, mid and low cases of international performance. Specifically, Mr. Fier relied exclusively on estimates provided to Aramid that were prepared by Capitol Films at the beginning of 2008 ("Capitol Estimates") for purposes of determining the high case. The base case was estimated as 85% of the high case and the low case was estimated as 85% of the base case. However, the Capitol Estimates are not reflective of certain factors and conditions that were present as of the Valuation Date, as detailed below:

(i)     During 2008 the domestic and international markets experienced a significant level of uncertainty as a result of the downturn in the global economy and the tightening of the global credit markets. As an example of the downturn, from January 2008 to March 2009, the S&P 500 index decreased by more than 50%, dropping a total of more than 700 points in a little over a year. Based on the timing of when the Capitol Estimates were prepared, the sales estimates do not appear to have considered the full impact of the market conditions present during 2008 and 2009. Further, as referenced in the articles Mr. Briggs attached to the report, the downturn in the economy had a particularly significant impact on the ability of independent film companies to achieve historical levels of international pre-sales, as well as the ability to obtain funds to finance the production and distribution of independent films. The articles Mr. Briggs references to support his opinion are as follows: (1) Indie-Film Shakeout: There Will Be Blood, by Erin Davies, Exhibit

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

A-1 to Suppl. Briggs Report; (2) Disaster, Horror, Tragedy: Film Makers Hit By Recession Disaster Movie, by Nick Clark, Exhibit A-2 to Suppl. Briggs Report; (3) Indie Films Suffer Drop-Off in Rights Sales, by Lauren A.E. Schuker, Exhibit A-3 to Suppl. Briggs Report; (4) Movie Industry Braced for Financing Crunch, by Steven Zetichik, Exhibit A-4 to Suppl. Briggs Report; and (5) The Recession That Ate The Art Films, by Dorothy Pomerantz, Exhibit A-5 to Suppl. Briggs Report.

(ii)   As of the Valuation Date, the Film did not have a domestic distribution deal in place. The lack of a domestic distribution deal would significantly limit the ability to sell international rights for the Film, particularly in light of the market conditions present during the two years prior to the Valuation Date. This is further supported by the limited sales activity associated with the Film prior to the Valuation Date, specifically noting that no major territories had been sold.

(iii)  It is the understanding of Mr. Briggs and The Salter Group that prior to the Valuation Date, significant efforts had been made to exploit the Film in several markets, and the Film was therefore generally well-known by potential rights acquirers and other market participants as of the Valuation Date. Taking this into consideration, as well as the challenges facing the market, it is Mr. Briggs' and The Salter Group's opinion that the Film would not have been able to achieve the level of sales estimated in the Capitol Estimates as of the Valuation Date. (Suppl. Briggs Report, at pp. 4-5.)

Mr. Briggs will testify that, although the Focus Report indicates that a $2.6 million New Mexico state tax credit was considered by Mr. Fier in valuing the Film, Mr. Briggs and The Salter Group understood that the State of New Mexico had refused to pay the balance of the tax credit to Aramid despite efforts prior to the

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

Valuation Date and no other potential acquirers submitted a bid for the Film that appeared to consider the tax credit as a guaranteed receivable.  As such, considering a tax credit to value a film under these circumstances is questionable.  (Suppl. Briggs Report, at p. 5.)

Mr. Briggs will testify that Section 6.6 of the Focus Report indicates that Mr. Fier determined a WACC of 11.5 %, which was applied in the discounted cash flow analysis described in Section 6.7.  Mr. Briggs will testify that based on his experience, this level of WACC is below the level of return demanded by investors in assets similar to the Film as of the Valuation Date, based on the following factors:

(i)     In light of the global economic recession, the availability of capital was limited as of the Valuation Date.  As such, it was very challenging to identify providers of capital willing to invest in the independent film asset class at an 11.5% level of required return.  Further, an 11.5% WACC is more reflective of the cost of capital associated with a pool of released major studio films during normal market conditions, as opposed to a single unreleased independent film during challenging market conditions.

(ii)    During 2008 and 2009, as a result of the global economic recession and tightening of the credit markets, there was a decrease in the pool of potential acquirers of international film rights, as evidenced, in part by the decrease in the number of attendees and overall interest in international film markets.

(iii)   As noted in the Focus Report, the beta applied in the WACC calculation was determined based on the beta arising from the entire media industry as obtained from a book published in 1995.  However, Mr. Briggs will opine it is undeniable that market return volatility changes over time.  As such, a level of volatility determined nearly 15 years prior to the Valuation Date is not indicative of the level of volatility present as of

- 23 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

the Valuation Date.  Further, applying the volatility associated with the entire media industry does not appropriately reflect the risk profile and volatility associated with a single unreleased film.  Mr. Briggs will testify that the media industry is comprised of a wide variety of companies, ranging from narrowly focused distribution companies to multi-national media conglomerates.  As such, the diversification underlying the media industry would significantly understate the volatility associated with a single film.  Further, in calculating the WACC, Mr. Fier does not consider an asset-specific risk premium that would address the specific risk characteristics of the Film.

(iv)   According to the Focus Report, Mr. Fier applied a debt-to-equity ratio of 50% for purposes of calculating the WACC.  In consideration of the risk profile associated with a single independent film, the lack of a domestic distribution deal as of the Valuation Date, and the limited availability of capital during this time period, among other factors, Mr. Briggs will testify that it is unlikely that a capital provider would have been willing to provide debt financing at a 50% debt-to-equity ratio. (Suppl. Briggs Report, at pp. 5-6.)

Mr. Briggs will testify that Section 7.1 of the Focus Report considers the market approach to valuing the Film based on the $8.5 million in loans made by Aramid in early 2008.  However, this data point in isolation is not indicative of the Film's value as of the Valuation Date.  Specifically, it is more reasonable to conclude that the value ascribed to the Film during early 2008 was determined based on more favorable market conditions that preceded the global economic downturn, including the age of the Film and other factors as previously described.  (Suppl. Briggs Report, at p. 6.)

Sections 7.2 through 7.4 of the Focus Report consider additional indications of value arising from the market approach to valuing the Film.  Specifically, Mr. Fier

1    cites:  (1) the El Entertainment domestic distribution agreement; (2) the opinion of

2    Aramid management based on a June 17, 2010, board meeting; and (3) indications

3    arising from the credit bid process.  Notwithstanding the foregoing, such indications

4    are based on information and events that occurred subsequent to the Valuation Date,

5    and is therefore inappropriate to use as a basis for valuing the Film as of the

6    Valuation Date.  Notwithstanding the unavailability of the information noted above,

7    Mr. Briggs will testify that the data points cited in the Focus Report do not consider

8    the Film's actual domestic box office performance of a $137,885 based on a

9    domestic theatrical release on only 11 screens.  Mr. Briggs will testify that the

10   extremely limited release and not surprisingly low level of domestic box office

11   performance would certainly impact the achievability of international sales at the

12   levels proscribed in the Focus Report.  (Suppl. Briggs Report, at p. 7.)

## O.   Relevance

14         Mr. Briggs's testimony is relevant because it evidences the fact that Plaintiffs

15   relied on an expert to determine the fair market value of "Love Ranch" prior to the

16   Foreclosure.  The fact that Plaintiffs hired a reputable third-party to determine the

17   fair market value of the Film, and then Cayman credit bid the higher amount of the

18   third party's valuation establishes that Cayman's credit bid was adequate.  In

19   particular, it is Defendants' burden to establish that the amount of proceeds of the

20   disposition is significantly below the range of prices that a complying disposition to a

21   person other than the secured party, a person related to the secured party, or a

22   secondary obligor would have brought.  Cal. Comm. Code § 9626(a)(5).

23   Accordingly, Mr. Briggs' testimony directly attacks Defendants' affirmative defense

24   for violation of California Commercial Code.  In addition, Mr. Briggs' testimony is

25   relevant to Plaintiffs' mitigation efforts.

## P.   Materials Relied Upon

27         In forming his opinion, Mr. Briggs relied on the following documents:

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

(i)     Engagement Agreement between The Salter Group and Stroock; authored by The Salter Group; dated November 5, 2009; bates labeled Salter_61-69;

(ii)    E-mail string from Eric Briggs to Kevin Rea with attachment of Love Ranch Budget; attachment prepared by Howard Baral; attachment prepared on or about November 17, 2009; bates labeled Salter_878-889; Defendants' Exhibit 61;

(iii)   Final Valuation Report for "Love Ranch"; authored by The Salter Group; dated December 7, 2009; bates labeled Salter_176-196; Plaintiffs' Exhibit 68;

(iv)    Cast and Summary Information Re: Love Ranch; prepared by Aramid; date unknown; bates labeled Salter_360-367; Plaintiffs' Exhibit 70;

(v)     By-territory license fee estimate for "Love Ranch"; prepared by Capitol Films; prepared as of August 10, 2007; bates labeled Salter_368-371; Plaintiffs' Exhibit 71;

(vi)    Love Ranch Final Budget; prepared by Howie Young; dated January 30, 2008; bates labeled Salter_222-364; Plaintiffs' Exhibit 72;

(vii)   Love Ranch Completion Budget Comparison; provided by Aramid prepared as of November 17, 2009; bates labeled Salter_209-221; Plaintiffs' Exhibit 73;

(viii)  Outstanding Liabilities - Love Ranch.doc; provided by Aramid; date unknown; bates labeled Salter_372-373;

(ix)    By-Territory Distribution Agreements; entered into by Capitol Films Limited and various entities on various dates; Plaintiffs' Exhibit 75;

(x)     Capitol Films Sales Estimates, prepared by Capitol Film; dated August 10, 2007; bates labeled Salter_368-371; Plaintiffs' Exhibit 105;

(xi)    Capitol Films Sales Estimates, prepared by Capitol Film; dated August 21, 2007; bates labeled AEFG_20905-20907; Plaintiffs' Exhibit 106;

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51399602

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

(xii)   Additional Capitol Films Sales Estimates, prepared by Capitol Film; dated August 10, 2007; bates labeled AEFG_6760-6763; Plaintiffs' Exhibit 107;

(xiii)  Materials included on CD containing production by The Salter Group; prepared by various persons and provided to The Salter Group by Aramid; prepared on various dates; bates labeled Salter_1-915; Plaintiffs' Exhibit 56;

(xiv)   Written material reviewed by Briggs prior to preparing the Opinion Report, prepared by various entities and persons on various dates; Plaintiffs' Exhibit 252;

(xv)    Focus Advisory Services, LLC; prepared by Phillip Fier; dated December 11, 2010;

(xvi)   Conversations with Daniel Rozansky in November , 2010, wherein Mr. Rozansky described that the Film was facing foreclosure on or about December 8, 2009 and wherein Mr. Rozansky explained that Defendants had brought prior legal action to enjoin the foreclosure sale;

(xvii)  Conversations with Daniel Rozansky in January, 2011, wherein Mr. Rozansky detailed that Plaintiffs had made efforts to obtain the $2.6 million tax rebate from the State of New Mexico; that Ray Reyes, counsel to Bontempo Productions LLC and Bontempo Holdings LLC, as well as for Bergstein and Tutor, had objected to the efforts of Plaintiffs to obtain the tax rebate; that Bergstein et al. had made no efforts to cooperate with Plaintiffs; that Plaintiffs' counsel wrote to the State of New Mexico on multiple occasions; that the State of New Mexico refused to turn over the tax rebate both pre and post-foreclosure; that there were no third parties bid on the Love Ranch collateral at the foreclosure; that Plaintiffs had to file a motion in New Mexico state court to obtain the rebate; that the State of New Mexico successfully

- 27 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1    opposed that motion; and that Plaintiffs obtained the tax rebate in or

2    about March 2010;

3    (xviii) Deposition of Phillip Fier from January 14, 2011; and

4    (xix)   Deposition of Joseph N. Cohen from January 20, 2011.

5

6    **JOSEPH N. COHEN:**

7    If allowed to testify as an expert, Mr. Cohen will testify as follows:

8    A.    **Background**

9    Mr. Cohen, who has served as President and CEO of American Entertainment

10   Investors for the past 15 years, will provide testimony as to his extensive experience

11   in the areas of film finance, valuation and foreclosure proceedings based on his more

12   than 40 years of experience as an:

13       1.    investment banker;

14       2.    founder and COO of multiple film finance companies;

15       3.    professor at the University of Southern California's School of Cinematic

16   Arts;

17       4.    Director of First California Financial Group (Holding Company), First

18   California Bank

19       5.    advisor on issues of film finance, valuation and foreclosure proceedings

20   to:

21           a) commercial lenders;

22           b) mezzanine lenders;

23           c) investment banks; and

24           d) a variety of film production and distribution companies.

25   (Deposition of Joseph Cohen ("Cohen Depo"), at 42:13-43:1, 67:23-69:9, 90:12-

26   94:14.)

27   Mr. Cohen has been personally involved in the preparation of foreclosure

28   proceedings on behalf of a mezzanine fund, which he co-manages. (Cohen Depo, at

- 28 -

LA 51399602

90:15-91:8.)  He has also been brought in as administrator to another mezzanine fund, Foundry Film Partners, to assist in the preparation of foreclosure proceedings in connection with several loans that were in default.  (Cohen Depo, at 91:9-13.)  In addition, Mr. Cohen has advised a number of big independent film production companies and distributors looking to expand their film libraries.  These acquisitions have included foreclosures or potential foreclosures.  (Cohen Depo, at 91:16-23.)

Mr. Cohen has been involved directly in the valuation and sale of a number of film libraries including the libraries of Kings Road, Handmade Films, and Largo Entertainment, LLC.  (Cohen Depo, at 92:9-15.)  Most recently, Mr. Cohen was appointed by Goldman Sachs to value the extensive 200 title library held by The Weinstein Company.  (Cohen Depo, at 93:8-16.)

**B.    Preparing The Foreclosure Sale**

In late October, 2009, Joseph Cohen began advising Stroock & Stroock & Lavan LLP ("Stroock") on preparations that should be taken in order to ensure that the foreclosure sale to be conducted on behalf of Aramid in connection with the motion pictures "Love Ranch" and "Five Dollars a Day" (the "Foreclosure") would exceed industry standards and be commercially reasonable as he understood was required by the California Commercial Code.  (Expert Witness Report of Joseph N. Cohen ("Cohen Report"), at 4:7-14.)  Mr. Cohen will testify that to ensure the Foreclosure exceeded industry standards, he recommended the following steps be taken:

1.    that advertising for the Foreclosure should be run on multiple occasions in The Hollywood Reporter and Daily Variety at least two weeks prior to the foreclosure sale;

2.    Aramid should make efforts to contact companies known in the film industry to have an interest in films such as "Love Ranch" and "Five Dollars a Day" (the "Pictures") and any companies that it has done business with that might be interested in purchasing the collateral related to the Pictures;

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

3.      Aramid should make information in its possession regarding the collateral available to potential bidders in a "data room" for inspection upon appointment;

4.      Aramid should hire The Salter Group, the preeminent valuer of films and libraries in the industry, to estimate the fair market value of the Pictures taking into consideration the fact that "Love Ranch" was an uncompleted film; and

5.      Aramid (or an affiliate), if it desired to credit-bid for the collateral, should bid no less than the fair market value for the collateral related to each Picture as determined by The Salter Group.

(Cohen Report, at 4:15-27; Cohen Depo, at 57:15-19.)

**C.      The Foreclosure Sale Exceeded Industry Standards**

Mr. Cohen will testify that:

1.      The frequency of publication of the Notice of Public Sale for the Foreclosure significantly exceeded the customary publicity levels for film foreclosure sales. ( Cohen Report, at 5:8-10.)

2.      The publication of the Notice of Public Sale for the Foreclosure occurred sufficiently ahead of the sale date to give interested parties time to conduct due diligence and to arrange financing for bids.  (Cohen Report, at 5:10-12.)

3.      The list of prospective bidders that Aramid contacted to inform about the sale included film distributors who typically have an interest in films such as "Love Ranch," including Fox Filmed Entertainment, MGM, Miramax, Overture Films, Summit Entertainment, Lionsgate, Anchor Bay, Nu Image, and Image Entertainment.  The companies contacted also included several prominent film sales agencies, who are experienced at selling distribution rights for films such as "Love Ranch."  These included Sierra Pictures, QED, Voltage Pictures, and Hyde Park Entertainment.  (Cohen Report, at 5:13-21.)

4.      Aramid contacted a significant subset of appropriate prospective bidders for "Love Ranch."  (Cohen Report, at 5:13-21.)

LA 51399602

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

5.      The materials that Aramid sent to companies it thought might be interested in bidding on "Love Ranch" and the materials that were provided to prospective bidders in the "data room" gave interested parties all necessary information about the collateral to conduct their due diligence and to formulate bids for the purchase of the collateral.  (Cohen Report, at 5:22-26.)

6.      The data room materials included information on the New Mexico tax credit.  (Cohen Depo, at 55:13-56:8.)

7.      Mr. Cohen reviewed the valuation report created by The Salter Group with respect to "Love Ranch."  The Salter Group valued the "Love Ranch" collateral between a low of $1,622,100 and a high of $2,013,400, depending on certain factors such as the collectability of historical sales, the fact that "Love Ranch" had not yet been completed, and the necessity to expend additional funds to complete "Love Ranch."  (Cohen Report, at 5:27-6:3.)

8.      Mr. Cohen recommended that Aramid (or an affiliate) credit-bid $2,013,400 for the "Love Ranch" collateral, as this amount represented the high end of the Salter Group's valuation of that collateral.  (Cohen Report, at 6:4-8.)

9.      That Aramid wanted the "Rolls-Royce" of foreclosure proceedings. (Cohen Depo, at 18:19-19:1.)

10.    That the Foreclosure was the "Rolls-Royce" of foreclosure proceedings. (Cohen Depo, at 24:21-25:4.)

11.    That the foreclosure sale was conducted in a commercially reasonable fashion.  (Cohen Report, at 6:9-10.)

12.    All timing requirements of the California Commercial Code, which he understood required that the sale be done according to industry standard, and the market for the purchase and sale of films in foreclosure were satisfied.  (Cohen Report, at 6:10-11; Cohen Depo, at 31:3-12, 32:11-20.)

13.    Significantly more publicity was generated for the foreclosure sale than is typical for movies that are being foreclosed upon.  (Cohen Report, at 6:12-14.)

14.     Significantly more publicity was generated for the foreclosure sale than is required by the California Commercial Code, which he understood required that the sale be done according to industry standard, both via advertising and via communications to potential bidders.  (Cohen Report, at 6:12-14; Cohen Depo, at 31:3-12, 32:11-20.)

15.     Sufficient information was made available to prospective bidders so that they could conduct due diligence.  (Cohen Report, at 6:14-16.)

16.     Prospective bidders had sufficient time to make any necessary financing arrangements to purchase the collateral.  (Cohen Report, at 6:16-17.)

**D.     Valuation of Love Ranch**

Mr. Cohen will testify that:

1.     The valuation parameters that Salter came up with and the considerations that it took into account in preparing the Love Ranch valuation were appropriate.  (Cohen Depo, at 83:21-84:10.)

2.     The discount factors Salter applied regarding the collectability of minor territories were appropriate.  (Cohen Depo, at 84:20-22.)

3.     No primary territories had been sold up to the time of the Foreclosure and that at that time, minor territorial distributors were regularly defaulting on previously entered into distribution agreements.  (Cohen Depo, at 84:23-85:2.)

4.     The previous and potential future litigation referenced in the Salter Report is a relevant factor in valuing the film "Love Ranch."  (Cohen Depo, at 85:8-10.)

5.     Contrary to the opinion given by Defendants' expert, that the amount of time passed since the sales process commenced impact the perception of the marketplace of the film "Love Ranch."  (Cohen Depo, at 85:11-15.)

6.     Further delays and ambiguity surrounding the delivery date of the film also impact the perception of the marketplace of the film "Love Ranch."  (Cohen Depo, at 85:15-17.)

LA 51399602

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

7.    Given the fact that there was no information or good prospects for a meaningful domestic theatrical release of the film "Love Ranch," it was appropriate that Salter dramatically discounted the sales estimates provided by Capitol. (Cohen Depo, at 87:11-16.)

8.    Given the uncertainties surrounding the New Mexico tax incentives, it was appropriate that no account was taken of them in the Salter Report. (Cohen Depo, at 87:18-25.)

9.    Defendants' expert's characterization of the health of the foreign marketplace and its willingness to put up minimum guarantees based on historical percentages of budget was incorrect. (Cohen Depo, at 99:10-17.)

10.    The international market has changed dramatically. (Cohen Depo, at 99:17-18.)

11.    Many international sales agents have had their lines of credit cut off and at the moment are not in the market for unfinished films. (Cohen Depo, at 99:18-21.)

12.    Defendants' expert's methodology for coming up with level of advances based on some historical percentages that may once have been applicable, are were no longer applicable. (Cohen Depo, at 99:21-100:3.)

13.    The domestic film marketplace has weakened dramatically. (Cohen Depo, at 100:3-4.)

14.    A number of the independent distributors that would have been the natural distributors for "Love Ranch" have disappeared from the marketplace and therefore there is a much greater concern as to what value there was for the film in the domestic marketplace. (Cohen Depo, at 100:4-9.)

15.    Defendants' expert's comments regarding the health of the home video market were highly speculative. (Cohen Depo, at 100:10-11.)

16.    There has been dramatic deterioration in the home video market, which should be reflected in any potential valuation. (Cohen Depo, at 100:12-14.)

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 33 -

17.     Defendants' expert's rebuttal of the Salter valuation was very much tied to the validity of the foreign sales estimates provided by Capitol.  Mr. Cohen would categorically recommend not lending against such non-arm's length estimates. (Cohen Depo, at 100:16-101:1.)

**E.     Relevance**

Mr. Cohen's testimony is relevant because it addresses the commercial reasonableness of the Foreclosure by evidencing that the preparation and execution of the Foreclosure exceeded the disposition methods that a reasonable dealer in the entertainment industry would use.  In addition, Mr. Cohen's opinions as to the valuation of the film "Love Ranch" are relevant as to the sufficiency of Plaintiffs' credit bid.

**F.     Materials Relied Upon**

Mr. Cohen relied on the following items in forming the opinions he will give at trial:

(i)     The notice of public sale ( "Notice of Public Sale") used by Aramid Entertainment Fund Limited ("Aramid") to publicize the foreclosure sale.  Authored by Eric Harbert; dated October 30, 2009; Plaintiffs' Exhibit 254.

(ii)     Information regarding the motion pictures "Love Ranch" and "Five Dollars a Day" which was sent by Aramid to companies Aramid thought might be interested in bidding at the foreclosure sale, along with a copy of the Notice of Public Sale.  Authored by Aramid; dated November 6, 2009; Plaintiffs' Exhibit 256.

(iii)     A list of the companies to which Aramid sent information regarding the Pictures and the Notice of Public Sale.  Authored by Eric Harbert; dated November 13, 2009; Plaintiffs' Exhibit 255.

(iv)     Materials made available to potential bidders by Aramid in its "data room" for the foreclosure sale, which included:

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 34 -

LA 51399602

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

a) a table of contents (authored by Aramid; date unknown; bates labeled AEFG_00069249);

b) production information, including the New Mexico tax incentive receivable (authored by Aramid; date unknown; bates labeled AEFG_00069250);

c) information regarding the film's principal elements(authored by Aramid; date unknown; bates labeled AEFG_00069251);

d) a film synopsis (authored by Aramid; date unknown; bates labeled AEFG_00069252-00069253);

e) sales summary (authored by Capitol Films; date unknown; bates labeled AEFG_00069254-00069255);

f) breakdown of available elements of the film (authored by Aramid; date unknown; bates labeled AEFG_00069256);

g) information regarding known outstanding liabilities(authored by Aramid; date unknown; bates labeled AEFG_00069257-00069258);

h) the film's budget (author unknown; date unknown; bates labeled AEFG_00069075-00069088);

i) the film's screenplay (authored by Mark Jacobson; date unknown; bates labeled AEFG_00069089-00069246);

j) chain of title information (authored by Aramid; date unknown; bates labeled AEFG_00069259-00069260);

k) distribution agreement for Iceland (author unknown; dated November 29, 2007; bates labeled AEFG_00068935-00068960);

l) distribution agreement for Greece (author unknown; dated January 16, 2008; bates labeled AEFG_00068962-00069290);

m) distribution agreement for Hungary (author unknown; dated January 28, 2008; bates labeled AEFG_00068904-00068934);

n) distribution agreement for Poland (author unknown; dated May 5, 2008; bates labeled AEFG_00068988-00069019);

- 35 -

LA 51399602

1         o) distribution agreement for Ex-Yugoslavia (author unknown; dated

2 January 30, 2008; bates labeled AEFG_00069048-00069074);

3         p) distribution agreement for Portugal (author unknown; dated January 30,

4 2008; bates labeled AEFG_00069020-00069047); and

5         q) distribution agreement for Middle East (author unknown; dated January

6 25, 2008; bates labeled AEFG_00068961-00068987).

7 The data room materials are collectively Plaintiffs' Exhibit 258.

8     (v)    Aramid's bid and sale procedures ("Bid and Sale Procedures") for the

9                foreclosure sale.  Authored by Aramid; date unknown; Plaintiffs'

10               Exhibit 258.

11     (vi)   A valuation report created by The Salter Group with respect to "Love

12               Ranch."  Authored by The Salter Group; dated December 7, 2009; bates

13               labeled Salter_0176-0196; Plaintiffs' Exhibit 258.

14     (vii)  Judge Wilson's Order Denying Plaintiffs' Application for a Permanent

15               Injunction, dated September 23, 2009, in <u>Cerulean Productions et al v.</u>

16               <u>Aramid Entertainment Fund Limited</u>.  Authored by Hon. Stephen V.

17               Wilson; dated September 23, 2009; Plaintiffs' Exhibit 269.

18    (viii)  The Declaration Of Karinne Behr In Opposition To Plaintiffs'

19               Applications For Right To Attach Order And Writs Of Attachment

20               Against Defendants David Bergstein And Ronald Tutor, and the

21               accompanying Exhibits 1 and 2 thereto.  Authored by Karinne Behr;

22               dated May 31, 2010; Plaintiffs' Exhibit 32.

23     (ix)   The Expert Report of Philip Fier.  Authored by Philip Fier; dated

24               December 11, 2010; Plaintiffs' Exhibit 247.

25     (x)    The Rebuttal Expert Report of Philip Fier.  Authored by Philip Fier;

26               dated January 13, 2011; Plaintiffs' Exhibit 248.

27     (xi)   Statements from Plaintiffs' counsel, Eric Harbert, regarding explanation

28               of commercial reasonableness under the California Commercial Code.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

**CHRISTINE M. HAMMER:**

If allowed to testify as an expert, Ms. Hameer will testify as follows:

**A.**   <u>Background</u>

Ms. Hammer will testify that she was asked by counsel for Plaintiffs to calculate damages resulting from David Bergstein's and Ronald Tutor's (collectively "Defendants") failure to repay certain loans to Plaintiffs.  In particular, Ms. Hammer was asked to calculate the total amount of the loans (excluding loan fees) plus interest owed under various assumptions described in detail below.  (Expert Report of Christine M. Hammer ("Hammer Report"), at ¶ 1.)

**B.**   <u>Qualifications</u>

Ms. Hammer will testify as to her qualification which include the following:

1.     Ms. Hammer is a Certified Public Accountant ("CPA").  She has maintained an active CPA license in California since I was certified in 1978. (Hammer Report, at ¶ 2.)

2.     Ms. Hammer  received a Master in Business Administration from the Stanford Graduate School of Business in 1975 and a BA in Political Science and Economics from Indiana University of Pennsylvania in 1970.  (Hammer Report, at ¶ 2.)

3.     Ms. Hammer has significant experience in complex cost allocation and cost estimation in a wide variety of industries as well as in many capacities such as management consulting, litigation consulting, and testimony.  These industries include, but are not limited to, financial and investment advisory services, manufacturing, information technology, telecommunications, entertainment, and medical equipment.  (Hammer Report, at ¶ 3.)

4.     Ms. Hammer has consulted independently since 1981 as Hammer & Associates, Inc.  She is also a Senior Advisor at Cornerstone Research, an economic consulting firm.  Her past employment includes:  Vice President, Management

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51399602

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1  Analysis Center (MAC); Principal, Putnam, Hayes & Bartlett; Senior Consultant,

2  Crocker National Bank; Auditor and Tax Accountant, Price Waterhouse & Co.

3  (Hammer Report, at ¶ 4.)

4  **C.    Summary of Opinions**

5      Ms. Hammer will testify to the following:

6      1.    Ms. Hammer's expert report is designed to be consistent with the

7  Court's ruling on the parties' cross-motions for partial summary adjudication dated

8  March 10, 2011 (the "Ruling").  (Hammer Report, at ¶ 6.)

9      2.    Damages in this case equal the total amount of unpaid principal

10  (excluding loan fees) plus unpaid interest and completion costs, if applicable.  Those

11  calculated damages range from $11,773,808 to $12,141,485, depending on the

12  assumptions used.  (Hammer Report, at ¶ 7.)

13  **D.    Terms of the Loans at Issue**

14      Ms. Hammer will testify to the following:

15      1.    That counsel has informed her that there are four loans at issue in this

16  case which were made to finance the production of two movies – "Bad Meat" and

17  "Love Ranch." (Hammer Report, at ¶ 8.)

18      2.    That counsel has informed her that no payments of principal or interest

19  have been made on any of the loans.  (Hammer Report, at ¶ 8.)

20      3.    That she reviewed a Bridge Loan Agreement (the "Bad Meat Loan

21  Agreement") dated April 9, 2008, entered into by Aramid and Tenderloin Holdings,

22  LLC ("Tenderloin") in connection with the motion picture "Bad Meat."  (Hammer

23  Report, at ¶ 9.)

24      4.    The loan had the following characteristics:

25          a)  The maturity date on the loan was 45 days later, May 24, 2008.

26          b)  Tenderloin requested that Aramid fund the loan in the amount of

27  $2,265,000 on April 11, 2008 subject to the terms in the Bad Meat Loan Agreement.

28  (Hammer Report, at ¶9.)

- 38 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

5.      That she reviewed a promissory note (the "First Love Ranch Loan Agreement") dated February 5, 2008, entered into by Aramid and Bontempo Holdings, LLC ("Bontempo") in connection with the motion picture "Love Ranch." ((Hammer Report, at ¶ 10.)

6.      The loan had the following characteristics:

        a)  The maturity date on the loan was April 7, 2008.

        b)      Bontempo requested that Aramid finance the loan in the amount of $2,000,000 in two separate borrowing certificates, the first request for $800,000 on February 8, 2008 and the second request for $1,200,000 on February 11, 2008 with both certificates subject to the terms in the First Love Ranch Loan Agreement. (Hammer Report, at ¶ 10.)

7.      That she reviewed a Bridge Loan Agreement (the "Second Love Ranch Agreement") dated March 24, 2008, entered into by Aramid and Bontempo in connection with the motion picture "Love Ranch."  This second loan was in addition to the $2,000,000 loaned in the First Love Ranch Loan Agreement.  (Hammer Report, at ¶ 11.)

8.      The loan had the following characteristics:

        a)      The maturity date on the loan was to be 90 days later, or June 22, 2008.

        b)      Bontempo requested that Aramid finance a loan in the amount of $5,525,000 on March 25, 2008 subject to the terms in the Second Love Ranch Agreement.  (Hammer Report, at ¶ 11.)

9.      That she reviewed a promissory note (the "Third Love Ranch Agreement") dated April 28, 2008, entered into by Aramid and Bontempo to fund an additional loan in connection with the motion picture "Love Ranch."  (Hammer Report, at ¶ 12.)

10.     The loan had the following characteristics:

- 39 -

a) The maturity date on the loan was to be the same as the Second "Love Ranch" Loan, or June 22, 2008.

b) Bontempo requested that Aramid finance a loan in the amount of $2,300,000 in two separate borrowing certificates, the first request for $1,715,000 on April 28, 2008 and the second request for $585,000 on May 8, 2008 with both certificates subject to the terms in the Second Amendment to the Bridge Loan Agreement. (Hammer Report, at ¶ 12.)

**E.    Damages Calculations**

Ms. Hammer will testify to the following:

1.    That she has calculated alternative measures of damages owed to Plaintiffs as the amount of unpaid principal on each of the four loans plus lawful interest owed. (Hammer Report, at ¶ 13.)

2.    In calculating damages, she was asked to assume that the amount dispersed for each loan is equal to the funded amount of the loan minus the loan fee. (Hammer Report, at ¶ 13.)

3.    That she was told by counsel that in foreclosure proceedings on 12/8/2009, Plaintiffs purchased the Love Ranch loan collateral with a credit-bid equal of $2,013,400. (Hammer Report, at ¶ 13.)

4.    In certain scenarios, she has been asked to assume that this credit-bid should reduce the amount owed on the Love Ranch loans. (Hammer Report, at ¶ 13.)

5.    She has also been asked to add costs of $1,872,988.79 associated with completing the "Love Ranch" movie to the total amount owed. (Hammer Report, at ¶ 13.)

6.    Based on instruction from counsel, damages have been calculated assuming an interest rate of 10% per year. (Hammer Report, at ¶ 13.)

7.    She has calculated damages using three different scenarios, with varying assumptions regarding the application of the credit-bid and completion costs to the Love Ranch loans. (Hammer Report, at ¶ 14.)

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 40 -

8.    Under the first scenario, Ms. Hammer, based on instruction from counsel, assumed that, for each loan, Plaintiffs are entitled to repayment of the amount dispersed, which is equal to the total loan amount less loan fees, plus simple interest accrued on the amount dispersed at an annual rate of 10% from the filing date of the complaint in this action until 5/2/2011.  (Hammer Report, at ¶ 15.)

9.    Interest is calculated based on the amount dispersed times the interest rate times the number of interest-earning days in the period divided by 365. (Hammer Report, at ¶ 15.)

10.    For the "Bad Meat" loan, interest was calculated in the amount of $228,575 which, added to the amount dispersed, yields a total amount owed of $2,253,575.  (Hammer Report, at ¶ 15.)

11.    For the First Love Ranch Loan, interest was calculated in the amount of $203,178 which, added to the amount dispersed, yields a total amount owed of $2,003,178.  (Hammer Report, at ¶ 16.)

12.    For the Second Love Ranch Loan, interest was calculated in the amount of $567,205 which, added to the amount dispersed, yields a total amount owed of $5,592,205.  (Hammer Report, at ¶ 16.)

13.    For the Third Love Ranch Loan, interest was calculated in the amount of $232,526 which, added to the amount dispersed, yields a total amount owed of $2,292,526.  (Hammer Report, at ¶ 16.)

14.    Under the second scenario, Ms. Hammer, based on instruction from counsel, assumed that, for each loan, Plaintiffs are entitled to repayment of the amount dispersed, which is equal to the total loan amount less loan fees, less a credit-bid of $2,013,400 plus simple interest accrued on the amount dispersed less the credit-bid at an annual rate of 10% from the filing date of the complaint in this action until 5/2/2011 plus completion costs for the "Love Ranch" film of $1,872,988.79. (Hammer Report, at ¶ 17.)

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 41 -

LA 51399602

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

15.     The credit-bid and completion costs are applied on a pro-rata basis across the three Love Ranch loans.  (Hammer Report, at ¶ 17.)

16.     The pro-rata amount for each Love Ranch loan is determined by weighting the credit-bid or completion costs by the ratio of the amount dispersed for the Love Ranch loan and the total amount dispersed for the three Love Ranch loans. (Hammer Report, at ¶ 17.)

17.     Interest is calculated based on the original principal amount times the interest rate times the number of interest-earning days in the period divided by 365. (Hammer Report, at ¶ 17.)

18.     For the "Bad Meat" loan, interest was calculated in the amount of $228,575 which, added to the amount dispersed, yields a total amount owed of $2,253,575.  (Hammer Report, at ¶ 17.)

19.     For the First Love Ranch Loan, interest was calculated in the amount of $157,137 and pro-rata completion costs of $379,446 which, added to the amount dispersed less the pro-rata credit-bid amount, yields a total amount owed of $1,928,691.  (Hammer Report, at ¶ 18.)

20.     For the Second Love Ranch Loan, interest was calculated in the amount of $438,673 and pro-rata completion costs of $1,059,287 which, added to the amount dispersed less the pro-rata credit-bid amount, yields a total amount owed of $5,384,262.  (Hammer Report, at ¶ 18.)

21.     For the Third Love Ranch Loan, interest was calculated in the amount of $179,834 and pro-rata completion costs of $434,255 which, added to the amount dispersed less the pro-rata credit-bid amount, yields a total amount owed of $2,207,280.  (Hammer Report, at ¶ 18.)

22.     Under the third scenario, Ms. Hammer, based on instruction from counsel, assumed that, for each loan, Plaintiffs are entitled to repayment of the amount dispersed, which is equal to the total loan amount less loan fees, less a credit-bid of $2,013,400 plus simple interest accrued on the amount dispersed less the

- 42 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1  credit-bid at an annual rate of 10% from the filing date of the complaint in this action

2  until 5/2/2011 plus completion costs for the "Love Ranch" film of $1,872,988.79.

3  (Hammer Report, at ¶ 19.)

4      23.   The entire credit-bid is deducted from the amount dispersed for the

5  Third Love Ranch Loan and the completion costs are added to the payments owed to

6  Plaintiffs for the Second Love Ranch Loan.  (Hammer Report, at ¶ 19.)

7      24.   Interest is calculated based on the amount dispersed less the credit-bid

8  times the interest rate times the number of interest-earning days in the period divided

9  by 365.  (Hammer Report, at ¶ 19.)

10      25.   For the "Bad Meat" loan, interest was calculated in the amount of

11  $228,575 which, added to the amount dispersed, yields a total amount owed of

12  $2,253,575.  (Hammer Report, at ¶ 19.)

13      26.   For the First Love Ranch Loan, interest was calculated in the amount of

14  $203,178 which, added to the amount dispersed, yields a total amount owed of

15  $2,003,178.  (Hammer Report, at ¶ 20.)

16      27.   For the Second Love Ranch Loan, interest was calculated in the amount

17  of $567,205 and completion costs of $1,872,989 which, added to the amount

18  dispersed, yields a total amount owed of $7,465,194.  (Hammer Report, at ¶ 20.)

19      28.   For the Third Love Ranch Loan, interest was calculated in the amount

20  of $5,260 which, added to the amount dispersed less the credit-bid amount, yields a

21  total amount owed of $51,860.  (Hammer Report, at ¶ 20.)

22  **F.**   **Relevance**

23      To the extent the Court requires, Ms. Hammer's testimony is relevant to the

24  applicable interest on damages in connection with the various defaulted loans at issue

25  in this case.  Please note that in order to make her calculations, Ms. Hammer had to

26  make certain assumptions as to the different potential applications of the credit bid

27  and completion costs.  To the extent these assumptions are inconsistent with the

28  court's ruling, Ms. Hammer is available to provide additional calculations.

- 43 -

**G.    Materials Relied Upon**

Ms Hammer relied on the following items in forming the opinions she will give at trial:

(i)      Bad Meat Loan Agreement(authored by Aramid and Tenderloin Holdings, LLC; dated April 9, 2008; bates labeled AEFG_00000001-000000024; Plaintiffs' Exhibit 5);

(ii)     First Love Ranch Loan Agreement (authored by Aramid and Botempo Holdings, LLC; dated February 5, 2008; bates labeled AEFG_00000168-000000174; Plaintiffs' Exhibit 9);

(iii)    Second Love Ranch Loan Agreement (authored by Aramid and Botempo Holdings, LLC; dated March 24, 2008; bates labeled AEFG_00000468-000000488; Plaintiffs' Exhibit 10);

(iv)    Third Love Ranch Loan Agreement (authored by Aramid and Botempo Holdings, LLC; dated April 28, 2008; bates labeled AEFG_00000503-000000510; Plaintiffs' Exhibit 12);

(v)     February 8, 2008, Love Ranch Borrowing Certificate (authored by Aramid; dated February 8, 2008; bates labeled AEFG_00000176-00000178; Plaintiffs' Exhibit 13);

(vi)    February 11, 2008, Borrowing Certificate (authored by Aramid; dated February 11, 2008; bates labeled AEFG_00000180-00000182; Plaintiffs' Exhibit 14);

(vii)   March 24, 2008, Love Ranch Borrowing Certificate (authored by Aramid; dated March 24, 2008; bates labeled AEFG_00000456-00000458; Plaintiffs' Exhibit 15);

(viii)  April 28, 2008, Love Ranch Borrowing Certificate (authored by Aramid; dated April 28, 2008; bates labeled AEFG_00000348-00000350; Plaintiffs' Exhibit 16);

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51399602

(ix)   May 8, 2008, Love Ranch Borrowing Certificate (authored by Aramid; dated May 8, 2008; bates labeled AEFG_00000351-00000353; Plaintiffs' Exhibit 17);

(x)   April 9, 2008, Bad Meat Borrowing Certificate (authored by Aramid; dated April 9, 2008; bates labeled AEFG_000000026-000000028; Plaintiffs' Exhibit 6);

(xi)   Representations from counsel regarding date complaint in this action was filed;

(xii)   Representations from counsel regarding the end date to be used in calculating damages;

(xiii)   Representations from counsel regarding interest rate to be used in the damages calculations; date complaint in this action was filed;

(xiv)   Representations from counsel regarding the application of the credit bid;

(xv)   Representations from counsel regarding the application of the completion costs; and

(xvi)   First Amended Complaint in this action.

Dated:  April 13, 2011

STROOCK & STROOCK & LAVAN LLP
JAMES E. FITZGERALD
DANIEL A. ROZANSKY
BENJAMIN T. POTTER
CRYSTAL Y. JONELIS


By: _____/s/ Daniel A. Rozansky_____
Daniel A. Rozansky

Attorneys for Plaintiffs
ARAMID ENTERTAINMENT
FUND LIMITED AND CAYMAN
FILM HOLDINGS LIMITED

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 45 -

LA 51399602